## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ERNESTO RODRIGUEZ** )<br>　　8610 Lonicera Court )<br>　　Brandywine, Maryland 20613 )<br>　　　　　　　　　　　　　　　　　　)<br>　　　　Plaintiff, )<br>　　　　　　　　　　　　　　　　　　)<br>　　　　v. )<br>　　　　　　　　　　　　　　　　　　) | **Civil Case No. _____** |
| **WASHINGTON METROPOLITAN** )<br>**AREA TRANSIT AUTHORITY** )<br>　　600 Fifth Street, N.W. )<br>　　Washington, DC 20001, ) | **JURY TRIAL DEMAND** |
| 　　　　Defendant. | |

## COMPLAINT

Ernesto Rodriguez (hereinafter referred to as "Plaintiff " or "Mr. Rodriguez"), by and through his undersigned counsel, Deyka Williams Spencer and The Spencer Firm, LLC, hereby files this Complaint against the Washington Metropolitan Area Transit Authority (hereinafter collectively referred to as the "Defendant" or "WMATA")  for unlawful employment practices on the basis of race (Black Hispanic/Afro-Decent) national origin (Panamanian), and color (Black/Brown) in violation of the Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), as amended, 42 U.S.C. §2000e, *et seq.*, and the District of Columbia Human Rights Act, D.C. Code §12-401 *et. seq.* ("DCHRA").

## JURISDICTION AND VENUE

1.　　This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1331, as it asserts a claim that arises under laws of the United States, specifically Title VII, as amended, 42 U.S.C. §2000e, *et seq*.

2. Venue is appropriate and based on the fact that a substantial part of the actions complained of are the result of actions and the employment practices of Defendant, a municipality within the District of Columbia. *Id*.

## EXHAUSTION OF REMEDIES

3. Plaintiff has exhausted all of his administrative remedies.

4. On or about April 30, 2019, Plaintiff submitted a Form 5 Charge for what was recorded as Agency No. 570-2019-02020 to the EEOC in which he alleged that he was subjected to disparate treatment, unequal terms of employment, placed on leave without pay, and terminated on the basis of his race (Black/Hispanic) national origin (Panamanian), and color (Black) in violation of Title VII and the DCHRA.

5. The claims were investigated by the EEOC. WMATA submitted a position statement and Plaintiff submitted a rebuttal.

6. The Plaintiff received his right to sue letter from the EEOC on September 16, 2019 and has timely filed his Complaint – within 90 days of receiving the letter.

## PARTIES

7. Plaintiff Rodriguez is a resident of Maryland and a United States Citizen.

8. Defendant, WMATA, is an instrumentality created by Congress to operate a mass transit system in the District of Columbia and the surrounding Metropolitan area and is subject to suit for the negligent, discriminatory, wanton, willful or wrongful acts and/or omissions of its employees or agents and is therefore liable, pursuant to the doctrine of *Respondeat Superior*.

## FACTUAL BACKGROUND

9. Plaintiff incorporates all information and allegations contained in the preceding paragraphs, as if fully set forth herein.

10. At all times relevant to the claims made herein, Plaintiff was a Metro Transit Police Department ("MTPD") Police Officer at WMATA.

11. Plaintiff Rodriguez began working for Defendant as a MTPD Police Officer on January 5, 2009.

12. Plaintiffs was under the governance of Chief of Police, Ronald Pavlik.

13. Plaintiff's national origin is Panamanian, and he is a brown skinned black man of Hispanic, Native, and African descent.

14. Mr. Rodriguez, in all 10 years of his employment for Defendant, had no incidents or violations until the alleged violation used as the cause (pre-text) for his termination.

15. At all times relevant to the claims made herein, Mr. Rodriguez was a volunteer for at risk youth in Maryland.

16. At all times relevant to the claims made herein, Mr. Rodriguez owned a non-profit company that aimed to assist troubled youth and others in the community with boxing and positive reinforcements.

17. Mr. Rodriguez was once a professional boxer and he used that knowledge to help people lose weight and assist youth in channeling their troubles in a healthy non-violent manner.

18. Mr. Rodriguez's company offered mentorship to young men and women at no cost.

19. Mr. Rodriguez did not view his company as employment; it was not designed for profit but to aid the community.

20. Mr. Rodriguez was also coaching young boxers initially at no cost.

21. One of Mr. Rodriguez's boxers, Jarrett "Swift" Hurd, began to make money through his victories in the boxing ring. As a result, Mr. Rodriguez began receiving a percentage of Mr. Hurd's awards after over 8 years of coaching him at no cost or monetary profit.

22. WMATA has a policy that requests employees seek permission from Chief Pavlik to have "outside employment".

23. Mr. Rodriguez submitted a request for outside employment in 2014 and 2016.

24. WMATA does not have a request from 2015 on record; even though Mr. Rodriguez continued in the same duties outside of the Defendant's workplace.

25. Management was aware that Mr. Rodriguez had outside employment; Mr. Rodriguez made them aware.

26. Management was aware that Mr. Rodriguez's boxer at the time, Jarrett Hurd, was becoming a successful fighter which included publicly known large award amounts.

27. On or about January 19, 2018, Mr. Rodriguez became injured on the job and was placed on worker's compensation by WMATA.

28. Mr. Rodriguez was out of work until he returned in a limited duty capacity on March 6, 2018.

29. Mr. Rodriguez went back onto worker's compensation on July 30, 2018 and returned to full duty work on January 2, 2019.

30. At no point during Mr. Rodriguez's time away from work did anyone in Management ask him to fill out a form for permission to have secondary employment.

31. At no point prior to January 2, 2019, did anyone in Management ask Mr. Rodriguez to disclose the amount of money that he made on Jarrett Hurd's fights.

32. Management was aware that Mr. Rodriguez was compensated as Jarrett Hurd's coach in 2017 because they admitted to seeing him on television coaching the boxer, were informed of the pay percentage to Mr. Rodriguez, and also asked Mr. Rodriguez to help in getting Jarrett Hurd to a charitable event on their behalf in 2018.

33. On January 4, 2019, only two days after Mr. Rodriguez returned to work, Management interviewed him as part of an investigation for worker's compensation fraud even though Mr. Rodriguez was forced to be placed on worker's compensation by WMATA when he fell on ice while chasing a suspect (he damaged his arm ligaments).

34. Management did not find evidence of worker's compensation fraud.

35. Management began asking Mr. Rodriguez details of how much money he made, although it was already disclosed to his supervisor, and informed him that he was supposed to disclose the amount to WMATA.

36. Management further informed Mr. Rodriguez that he was supposed to request permission for secondary employment.

37. Mr. Rodriguez was not allowed to request secondary employment once he was reminded that it should've been submitted.

38. Mr. Rodriguez admitted to not submitting in prior years with the exception of 2014 and 2016.

39. Management did not reprimand him in the past for not submitting the paperwork requesting secondary employment or disclosing any payments.

40. During the second investigative interview conducted by Management which occurred on January 15, 2019, Mr. Rodriguez decided to record the meeting since he had forgotten what was previously discussed in the January 4, 2019 meeting.

41. Mr. Rodriguez was under the impression that he was allowed to record the interview because it was in his view "an official sanctioned investigation" which allowed recordings.

42. During the meeting the Management officials became upset that he was recording the meeting and informed him that they did not allow it.

43. Mr. Rodriguez put his phone away and complied with the investigator's request to stop the recording despite having knowledge that the General Order allowed recordings during official investigations.

44. Article 10 of WMATA's General orders provide for disciplinary actions with the intent to "correct employee behavior".

45. WMATA's orders include informal counseling by way of verbal or written counseling to employees to place the employee on notice of a violation of a policy.

46. WMATA's orders also provide for written or verbal reprimands to place the employee on notice of a violation or alleged violation which allows the employee the opportunity to review the written allegations, sign confirming receipt, keep a copy, and comment in writing with an opportunity to rebut the claims made against him or her.

47. Neither of the two initial disciplinary actions were offered to Mr. Rodriguez for his alleged violations of General Orders or Oath of Office.

48. After reviewing the investigative report against Mr. Rodriguez, Chief Pavlik agreed to terminate Mr. Rodriguez on January 28, 2019 for not reporting his income and for recording the interview.

49. Chief Pavlik's decision to terminate Mr. Rodriguez was extreme and exhibited that he treated him more harshly than he did others that were not black or Hispanic, brown or dark in color and of a different national origin.

50. Similarly situated comparators were not terminated for the same alleged infractions.

51.     Chief Pavlik had the option of allowing Mr. Rodriguez to fill out the reports of income and seek permission for secondary employment as a corrective measure but did not utilize that option.

52.     Chief Pavlik did not terminate the white American Officers that failed to obtain permission for secondary employment and thereby failed to report their income.

53.     Chief Pavlik did not terminate white American Officers that had similar or more egregiously alleged violations that Non-American or Non-white Police Officers.

54.     Chief Pavlik allowed white American officers with similar alleged offenses the opportunity to correct their alleged errors and continue employment.

55.     Chief Pavlik has exhibited a pattern of treating black officers more harshly than white officers.

56.     Chief Pavlik has exhibited a pattern of treating Non-American officers more harshly than American born officers.

## CAUSES OF ACTION

### COUNT ONE
### (Discrimination on the Basis of Race, National Origin, Color)

57.     Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth, herein.

58.     Plaintiff is a member of a protected class.

59.     John Bibbs (white American) Officer under the management of Chief Pavlik had failed to obtain permission from the Chief for secondary employment.

60.     Mr. Bibbs allegedly operated a home improvement company while employed with WMATA and falsely reported sick leave/worker's compensation at the time that he was found to

be in Florida working on rental property for profit; he was obtaining secondary income and had secondary employment without reporting it and doing so in a conspicuous manner.

61. Mr. Bibbs was allowed to continue employment with WMATA despite similar yet more harsh allegations against him.

62. Mr. Bibbs was employed and allowed to continue working for WMATA despite his infractions all during times relevant to this Complaint.

63. Mr. Rodriguez on the other had obtained permission to have secondary employment in 2014 and 2016.

64. Mr. Rodriguez applied to get permission for secondary employment in 2017 but through an administrative error, he later learned the document was not processed.

65. Mr. Rodriguez was not contacted or reprimanded for not reporting his income in 2017.

66. Mr. Rodriguez's coaching of Jarrett Hurd and other boxers was not conspicuous. Management was aware that he was coaching Mr. Hurd and even attended some fights that Mr. Rodriguez participated in as the coach.

67. On or about February 27, 2017 Mr. Rodriguez told his direct supervisor, Seargent Matthew Muller that he was getting a percentage of income from Jarett Hurd fights.

68. The fights were televised and were well known among WMATA Management.

69. The Defendant's decision to terminate Mr. Rodriguez was due to his race, national origin, and color.

70. Mr. Rodriguez has been treated differently and subjected to different terms and conditions of his employment due to his race, national origin, and color.

71. Mr. Rodriguez was treated differently than Non-American Officers, White Officers, and lighter skinned Officers.

72. Mr. Rodriguez's race, national origin, and color were a determining and motivating factor in Defendant's unlawful conduct towards him.

73. The reasons proffered by Defendant for the termination are pretextual.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays that this Honorable Court:

a. Award compensatory damages;

b. Damages and equitable relief for all harm Plaintiff has sustained as a result of Defendant's unlawful conduct including for loss of promotional potential, reputation, lost wages, lost job benefits he would have received but for Defendant's unlawful conduct;

c. Award any medical costs and expenses incurred as a result of Defendant's unlawful conduct;

d. Award reasonable attorney fees, costs, and expenses incurred for this action;

e. Order Defendant to reinstate the Plaintiff.

f. Equal Employment Opportunity training for Defendant and the supervisory officials at issue herein;

g. Supervisory training for the supervisors at issue herein;

h. Award equitable, declaratory, and injunctive relief; and

i. Award such other and further relief as this Honorable Court deems just and proper.

Respectfully submitted,

            \_\_\_\_\_/s/_____
            Deyka Williams Spencer
            The Spencer Firm, LLC.
            Bar Number: 979180
            200-A Monroe Street, Suite 305
            Rockville, MD 20850
            Telephone: 301-637-2866
            Fax: 866-686-2126
            dspencer@spencer-firm.com