## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**ERNESTO RODRIGUEZ,**

**Plaintiff,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,**

**Defendant.**

Civil Action No. 19-3710 (JEB)

## <u>MEMORANDUM OPINION</u>

Plaintiff Ernesto Rodriguez is a successful boxing coach.  The problem, according to his former employer, Defendant Washington Metropolitan Area Transit Authority, is that he should not have been coaching while out on workers'-compensation leave.  When WMATA discharged him, pointing to this work and his untruthfulness about it in an administrative investigation, Rodriguez sued.  He alleges that this termination was actually motivated by his race, color, and national origin, thereby constituting unlawful discrimination.  Both parties now cross-move for summary judgment.

Believing that WMATA generally has the stronger position, the Court will grant its Motion on the bulk of Plaintiff's claims, but not as to race discrimination.  The Court will also deny Plaintiff's Motion in its entirety, meaning that this fight will go another round.

## I.      Background

###   A.   Factual Background

Because the Court is focusing on Defendant's Motion for Summary Judgment, it will

construe the facts in the light most favorable to Plaintiff.  See Talavera v. Shah, 638 F.3d 303,

308 (D.C. Cir. 2011).

Rodriguez worked as a Metro Transit Police Department officer at WMATA from 2009

until January 2019, when he was discharged.  See ECF No. 13-2 (Pl. Resp. to Def. SMF), ¶¶ 1,

35.  He identifies his national origin as Panamanian, his color as Black, and his race as Black and

Hispanic.  Id., ¶ 3.  Rodriguez was on leave due to injury and received workers' compensation

from January to March 2018, and again from July 2018 to January 2019.  Id., ¶¶ 4, 12; see also

ECF No. 1 (Compl.), ¶¶ 11, 27, 29; ECF No. 13-4, Exh. B (Office of Professional Responsibility

and Inspections (OPRI) Report) at 163.

In 2018, MTPD's OPRI conducted an audit of the ten MTPD officers on workers'-

compensation leave at the time.  See Pl. Resp. to Def. SMF, ¶¶ 4, 7.  Sergeant Daniel Alvarez

and Captain Gregory Hanna were in charge.  Id., ¶ 6.  As part of the audit, Alvarez discovered

that Plaintiff was training a professional boxer, Jarrett Hurd.  Id., ¶ 9.  Alvarez viewed multiple

photos and videos on social media of Rodriguez and Hurd training together, some of which were

taken after Plaintiff went on leave in July 2018.  Id., ¶¶ 9–10.  Alvarez and Hanna thus requested

that Rodriguez meet with them for an administrative interview on January 4, 2019, shortly after

Plaintiff was scheduled to return to work.  Id., ¶¶ 11–13.

In the recorded interview, Alvarez asked Plaintiff if he was working in any off-duty

secondary employment.  Id., ¶ 13.  Rodriguez responded that he had been volunteering as a

boxing coach since 2000.  Id., ¶ 14.  Alvarez then asked him if he was familiar with MTPD

General Order 245, which requires officers to seek approval from the MTPD Chief for any off-duty employment.  Id., ¶ 17.  General Order 245 also lists an additional level of required approval from the MTPD Chief for any officer seeking off-duty employment while on workers'-compensation leave.  Id., ¶ 20.  Rodriguez admitted that he was familiar with the General Order and that he had sought approval to work as a boxing coach in some prior years.  Id., ¶¶ 17–18.  When asked whether he was compensated for training boxers, Rodriguez informed Alvarez that he had made $500,000 from two fights that Hurd had won.  Id., ¶ 19.

Plaintiff was thus placed on administrative leave with pay, and MTPD conducted a second administrative interview on January 15, 2019.  Id., ¶¶ 21–22.  During that interview, Alvarez noticed that Rodriguez was recording the proceedings on his cell phone.  Id., ¶ 23.  He then told "[P]laintiff that 'surreptitiously' recording another officer is a violation of [MTPD] General Order 217."  ECF No. 17-1 (Def. Resp. to Pl. SMF), ¶ 25.  That Order states, however, that the recording policy "does not include official sanctioned investigations," id., ¶ 26, which are not defined, and the parties dispute whether the interview was part of such an investigation. Id.  At the end of the interview, Rodriguez was transferred to administrative leave without pay. Id., ¶ 38.

After consulting with WMATA's in-house counsel, Alvarez and Hanna submitted a report and recommendation to Chief of Police Ronald A. Pavlik, Jr.  See Pl. Resp. to Def. SMF, ¶¶ 26, 30.  Chief Pavlik agreed with the investigation's findings, including that Plaintiff had failed to seek approval to engage in outside employment while on workers'-compensation leave. Id., ¶ 33.  On January 28, 2019, Pavlik fired Rodriguez and issued a Letter of Termination setting forth a summary of his reasons.  Id., ¶ 35.  Those included Rodriguez's violation of General Orders 217 and 245.  See OPRI Report at 159–60.

B. <u>Procedural History</u>

Plaintiff responded by filing an EEOC charge alleging discrimination on the basis of race, color, and national origin, <u>see</u> ECF No. 10-4 (EEOC Charge), and he received a right-to-sue letter on September 16, 2019. <u>See</u> Compl., ¶ 6. He then filed this lawsuit three months later. <u>Id.</u> Rodriguez alleges that WMATA discriminated on the basis of race, color, and national origin when it discharged him, in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and the District of Columbia Human Rights Act, D.C. Code § 12-401 *et seq.* (DCHRA). <u>Id.</u>, at 1 & ¶¶ 57–73. Defendant now moves for summary judgment. Plaintiff, for his part, opposes that Motion and also cross-moves for summary judgment.

## II.   **Legal Standard**

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>see also</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247–48 (1986); <u>Holcomb v. Powell</u>, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 248; <u>Holcomb</u>, 433 F.3d at 895. A dispute is "'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Liberty Lobby</u>, 477 U.S. at 248; <u>see also</u> <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007); <u>Holcomb</u>, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998). The Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-movant, in other words, is required to provide evidence that would permit a reasonable jury to find in his favor. See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## III. Analysis

WMATA moves for summary judgment on the ground that it terminated Rodriguez for nondiscriminatory reasons — namely, for engaging in unapproved secondary employment while out on workers'-compensation leave, for misleading MTPD about that employment, and for recording the administrative interview. See ECF No. 10-1 (Def. MSJ) at 1–2. Rodriguez counters that there remains a jury question about whether WMATA's stated reasons for his termination are pretext for discrimination, maintaining that Defendant treated similarly situated White employees more favorably and that it has a history of employment discrimination. See ECF No. 13-3 (Pl. Opp.) at 1–5. Rodriguez also contends that he should be the one to whom summary judgment is granted. Id. at 30. Because he makes no substantive argument to support such position, id., the Court focuses its analysis on WMATA's Motion and briefly discusses Rodriguez's at the end of this Opinion.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court established the three-part burden-shifting framework that governs traditional claims of employment discrimination in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973). Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. When he "meets this burden, '[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason' for its action. If the employer succeeds, then the plaintiff must 'be afforded a fair opportunity to show that [the employer's] stated reason . . . was in fact pretext' for unlawful discrimination." Chappell-Johnson v. Powell, 440 F.3d 484, 487 (D.C. Cir. 2006) (quoting McDonnell Douglas, 411 U.S. at 802, 804) (citation omitted).

When, however, "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not – and should not – decide whether the plaintiff actually made out a *prima facie* case under McDonnell Douglas." Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis omitted). The Court's task in such cases is to "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" Id. Thus, the "relevant inquiry" is whether an employee has "produced sufficient evidence for a reasonable jury to conclude that the [defendant's] asserted nondiscriminatory reason for firing

h[im] was not the actual reason, and that instead the [defendant] was intentionally discriminating."  Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1114 (D.C. Cir. 2016).

In this case, there is no dispute that Rodriguez was discharged.  See Pl. Resp. to Def. SMF, ¶ 35.  And Defendant has put forth a legitimate reason for its decision — i.e., because Plaintiff violated General Orders 217 and 245.  That justification is supported by "admissible evidence," is "clear and reasonably specific" as well as "facially credible in light of the proffered evidence," and could lead a jury to reasonably "find that the employer's action was motivated by a nondiscriminatory reason."  Figueroa v. Pompeo, 923 F.3d 1078, 1087 (D.C. Cir. 2019) (internal quotation marks omitted).  The Court's inquiry is thus focused on the third step of the McDonnell Douglas framework, which asks whether WMATA's "stated reason . . .  was in fact pretext' for unlawful discrimination."  Chappell-Johnson, 440 F.3d at 487 (quoting McDonnell Douglas, 411 U.S. at 804).

A.  Preliminary Issues

While Rodriguez's Title VII race-discrimination claim will be discussed in depth below, his numerous other theories of liability can be disposed of in short order.  More specifically, the Court will grant summary judgment to Defendant with regard to Plaintiff's claims under the DCHRA, as well as his Title VII national-origin and color-discrimination claims.  Finally, to the extent that Rodriguez alleges a stand-alone claim of "pattern or practice" discrimination under Title VII, this one too is knocked out.

1.  *DCHRA*

Although Rodriguez does not list a separate count invoking the DCHRA in his Complaint, the Court will afford him the benefit of the doubt and construe the references in that pleading and in his briefing as alleging unlawful discrimination under that Act.  See Compl. at 1

& ¶¶ 4, 57; <u>see also</u> Pl. Opp. at 16.  But that is as far as Plaintiff's claims pursuant to the DCHRA go, as WMATA correctly points out that it is immune from such an action here.  <u>See</u> Def. MSJ at 8–9.

"WMATA is the creation of an interstate compact ('the Compact') signed by Maryland, Virginia, and the District of Columbia.  It is therefore an instrumentality of those jurisdictions." <u>White v. Washington Metro. Area Transit Auth.</u>, 303 F. Supp. 3d 5, 9 (D.D.C. 2018).  As a number of courts in this district have recognized, "[T]he Compact itself clarifies that 'one signatory may not impose its legislative enactment upon the entity created by it without the express consent of the other signatories and the Congress of the United States.'"  <u>Id.</u> (quoting <u>Lucero-Nelson v. Wash. Metro. Area Transit Auth.</u>, 1 F. Supp. 2d 1, 7 (D.D.C. 1998)); <u>see also</u> <u>Hunter v. Wash. Metro. Area Transit Auth.</u>, 485 F. Supp. 3d 65, 81 (D.D.C. 2020).  For that reason, "[i]t is well-established that WMATA is not subject to the DCHRA" unless Maryland and Virginia consent to such a suit.  <u>Taylor v. WMATA</u>, 109 F. Supp. 2d 11, 18 (D.D.C. 2000).

Neither Plaintiff's Complaint nor anything else in the record contains any "indication that Maryland and Virginia have consented to suit under the DCHRA."  <u>White</u>, 303 F. Supp. 3d at 9. Indeed, Rodriguez never contests WMATA's immunity defense.  <u>See</u> Pl. Opp. at 16–17.  Any claim against WMATA pursuant to the DCHRA thus ends here.

### 2.  *National-Origin Discrimination*

Turning to Title VII, Defendant moves for summary judgment on Rodriguez's national-origin claim on the ground that Chief Pavlik did not know, and thus could not have discriminated on the basis of, Rodriguez's national origin.  <u>See</u> Def. MSJ at 12–13.  Plaintiff does not dispute Pavlik's lack of knowledge.  <u>See</u> Pl. Opp. at 18.  To be sure, Pavlik need not have known that Rodriguez was from <u>Panama</u> to discriminate on the basis of national origin.  The EEOC's

guidelines define such discrimination to include acts taken "because an individual has the physical, cultural or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1. It is thus "not necessary to show that the alleged discriminator knew the <u>particular</u> national origin group to which the complainant belonged." Guidelines on Discrimination Because of National Origin, 45 Fed. Reg. 85,632, 85,633 (Dec. 29, 1980); <u>see also</u> <u>EEOC v. WC&M Enterprises, Inc.</u>, 496 F.3d 393, 401–02 (5th Cir. 2007). Here, however, Plaintiff provides no reason for the Court to infer that Pavlik was even aware that he has an immigrant background, much less that Pavlik discriminated against him for that reason. In <u>Burley v. National Passenger Rail Corp.</u>, 801 F.3d 290 (D.C. Cir. 2015), the D.C. Circuit explained that the "primary flaw in [the plaintiff's] attempt to show pretext . . . is that it is undisputed that the [] supervisors who denied the waiver and disciplined [the plaintiff] did not know his race." <u>Id.</u> at 300. The same logic applies here. <u>See</u> <u>Groce v. Billington</u>, No. 90-2057, 1992 WL 280363, at *3 (D.D.C. Sept. 3, 1992) ("Because plaintiff has failed to demonstrate that the rating panel members had knowledge of his race when they made their rating decisions, he has failed to present a prima facie claim of discrimination under Title VII.").

Beyond Pavlik's lack of knowledge, Rodriguez does not identify an iota of evidence evincing discrimination based on national origin. <u>See</u> Pl. Opp. at 18. For instance, he never identifies the national origin of the comparators he introduces for purposes of litigating his race-discrimination claim. <u>See</u> Pl. Opp. at 19–24. As a result, this claim can proceed no further.

### 3. *Color Discrimination*

Plaintiff's claim of color discrimination under Title VII meets the same fate. "Although not defined in the statute, Title VII claims based on color have been interpreted by the courts as relating to the complexion of one's skin." <u>Howard v. D.C. Pub. Sch.</u>, 501 F. Supp. 2d 116, 121

n.15 (D.D.C. 2007) (collecting cases).  In other words, to the extent that courts have analyzed claims of color discrimination separate from race-based claims, they have looked to whether the "particular hue of the plaintiff's skin is the cause of the discrimination, such as in the case where a dark-colored African-American individual is discriminated against in favor of a light-colored African-American individual."  Bryant v. Bell Atl. Maryland, Inc., 288 F.3d 124, 132 n.5 (4th Cir. 2002); see also Felix v. Marquez, No. 78-2314, 1980 WL 242, at *1 (D.D.C. Sept. 11, 1980).

    In this case, although Rodriguez makes a passing reference to color discrimination, he "does not make any arguments based on complexion of h[is] skin color, but rather argues race discrimination."  Howard, 501 F. Supp. 2d at 121 n.15; see also Pl. Opp. at 18–22.  The Court therefore understands his color-discrimination claim to be subsumed by his race-discrimination claim, which the Court analyzes below.  See Howard, 501 F. Supp. 2d at 121 n.15.  And to the extent that Plaintiff separately alleges color discrimination, the Court notes that he has not identified any similarly situated Black officers with a different complexion who were treated more favorably or even made mention of the hue of his own skin.  Indeed, while Rodriguez identifies four comparators who were allegedly treated more favorably than he was, they are all white.  See ECF No. 13-1 (Pl. SMF), ¶ 58.

### 4.  *Pattern or Practice of Discrimination*

    Before analyzing the crux of Plaintiff's complaint of race discrimination under Title VII, there is one last preliminary issue to address.  In addition to alleging race discrimination against himself alone, Rodriguez appears to allege that Defendant has a "pattern or practice" of such conduct.  See Pl. Opp. at 23, 24, 27.  WMATA rejoins that the Court should dismiss any such

claim because it is improperly brought by an individual plaintiff.  See ECF No. 17 (Def. Reply) at 2–4.  The Court agrees.

Under the pattern-or-practice framework, "a class of plaintiffs may submit 'proof of the pattern or practice' of discrimination that 'supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made pursuant to that policy.'"  Marcus v. Geithner, 813 F. Supp. 2d 11, 20 (D.D.C. 2011) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 362 (1977)).  But "myriad rulings from members of this court and elsewhere have unanimously affirmed the proposition that an individual plaintiff may not bring a standalone 'pattern or practice' claim outside the context of a class action."  Id.; see also Calobrisi v. Booz Allen Hamilton, Inc., 58 F. Supp. 3d 109, 113 (D.D.C. 2014) ("[T]hese pattern and practice allegations are not relevant to venue because, as other courts in this Circuit have previously determined, individual plaintiffs such as Calobrisi cannot bring a pattern or practice claim under Title VII.").  Plaintiff here offers no rebuttal on this point.  See ECF No. 18 (Pl. Reply) at 3–4.

Because Rodriguez is the sole plaintiff, the Court grants Defendant's Motion to the extent that he "purports to pursue a 'pattern or practice' claim that is distinct from the McDonnell Douglas framework."  Marcus, 813 F. Supp. 2d at 20.  Of course, as an individual plaintiff, Rodriguez may nonetheless "introduce evidence of systematic or general discrimination when developing h[is] individual discrimination claims within the McDonnell Douglas framework." Id. at 20–21 (collecting examples).  The Court will thus consider that type of evidence as it continues its analysis.

B.  Race Discrimination

1.  *Single-Motive and Mixed-Motive Discrimination*

The undercard bouts having been completed, the Court now arrives at the main event:

Plaintiff's claim of individual race discrimination under Title VII.  Before delving into the

merits, the Court must determine the proper legal framework for evaluating that claim.  While

Rodriguez's briefing on the issue is not a model of clarity, he appears to invoke both the "single-

motive" theory of discrimination as well as the "mixed-motive" theory.  See Pl. Opp. at 12–13.

Defendant does not directly address the latter and presumes that Plaintiff is bringing only a

single-motive or "but-for" discrimination case.  See Def. Reply at 5.  Although Rodriguez could

do more to precisely articulate his theory — and "at some point he must place the employer and

court on notice as to the theory or theories under which he intends to proceed," Ponce v.

Billington, 679 F.3d 840, 845 (D.C. Cir. 2012) — his repeated references to the mixed-motive

theory are sufficient for the Court to analyze the issue through that lens as well.  See Compl.,

¶ 72; Pl. Opp. at 12–13, 17.  Because "a plaintiff may ultimately decide to proceed under both

theories of liability," Ponce, 679 F.3d at 845, the Court will assume that is Rodriguez's current

position.

In addition to the single-motive, but-for standard provided for in 42 U.S.C. § 2000e-

2(a)(1), section 2000e–2(m) states that "an unlawful employment practice is established

when . . . race, color, religion, sex, or national origin was a motivating factor for any

employment practice."  (emphasis added).  Authorizing what is known as a "mixed-motive"

case, that provision allows a plaintiff to prevail by showing that discrimination was "a factor

motivating the adverse action."  Ginger v. District of Columbia, 527 F.3d 1340, 1345 (D.C Cir.

2008).  "Importantly, however, relief in a mixed-motive case is limited to 'declaratory relief,'

certain 'injunctive relief,' and certain fees and costs if the defendant 'demonstrates that [it] would have taken the same action in the absence of the impermissible motivating factor.'" Ponce, 679 F.3d at 844–45 (quoting 42 U.S.C. § 2000e–5(g)(2)(B)). "By contrast, a plaintiff who establishes but-for causation may recover damages, as well as declaratory and injunctive relief." Id. at 845.

How, then, should the Court evaluate Plaintiff's twin theories of liability at summary judgment? Given that "a plaintiff can use evidence of pretext and the McDonnell Douglas framework to prove a mixed-motive case," Ponce, 679 F.3d at 844 (citing Fogg v. Gonzales, 492 F.3d 447, 451 n.* (D.C. Cir. 2007)), as well as a but-for case, that is how the Court will analyze the issues. Under that framework, as Rodriguez has done enough to defeat summary judgment on his but-for discrimination claim, he has also "necessarily" made the requisite showing with regard to his mixed-motive claim. See Ponce, 679 F.3d at 845.

### 2. *Evidence of Pretext*

At last, the Court reaches the merits. To review, WMATA has offered a nondiscriminatory reason for terminating Rodriguez — *i.e.*, that he engaged in secondary employment without authorization while on workers'-compensation leave, misled MTPD about that employment, and impermissibly recorded the administrative interview with MTPD investigators. See Def. MSJ at 1–2. The "relevant inquiry" is thus whether Plaintiff has "produced sufficient evidence for a reasonable jury to conclude that [Defendant's] asserted nondiscriminatory reason for firing h[im] was not the actual reason." Wheeler, 812 F.3d at 1114.

"A plaintiff may support an inference that her employer's stated reasons for undertaking the adverse employment action in question were pretextual by citing a number of possible sources of evidence, including 'the employer's better treatment of similarly situated employees

13

outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation

from established procedures or criteria, [ ] the employer's pattern of poor treatment of other

employees in the same protected group as the plaintiff, or other relevant evidence that a jury

could reasonably conclude evinces an illicit motive.'" Id. at 1115 (quoting Walker v. Johnson,

798 F.3d 1085, 1092 (D.C. Cir. 2015)).  In this case, Rodriguez supports the inference of

discrimination by demonstrating that similarly situated white officers engaged in comparable

misconduct yet were not fired, and that MTPD has a history and pattern of discrimination.  See

Pl. Opp. at 22–30.

    "Probably the most commonly employed method of demonstrating that an employer's

explanation is pretextual is to show that similarly situated persons of a different race or sex

received more favorable treatment."  1 Lex K. Larson, Employment Discrimination § 8.04, at 8–

66 (2d ed. 2007), quoted in Brady, 520 F.3d at 495.  To prove that he is similarly situated to

another employee, the plaintiff must demonstrate that he and the other employee "were charged

with offenses of comparable seriousness" and "that all of the relevant aspects of his employment

situation were nearly identical to those of the other employee."  Burley, 801 F.3d at 301

(quotation marks and alteration omitted).  "Factors that bear on whether someone is an

appropriate comparator include the similarity of the plaintiff's and the putative comparator's job

and job duties, whether they were disciplined by the same supervisor, and, in cases involving

discipline, the similarity of their offenses."  Id.

    Rodriguez contends that four white WMATA officers are appropriate comparators.  See

Pl. SMF, ¶ 58.  While he identified additional possible ones in his EEOC charge and his

Complaint here, at the summary-judgment stage, he sticks to only the four: S.M., W.O., C.S., and

L.E.  See Pl. Opp. at 10.  Defendant does not dispute that each of these people is white and that,

except for C.S., they all had similar job duties and were disciplined by Chief Pavlik.  See Def. Reply at 12–17; see also ECF No. 13-9, Exh. H (L.E. Report); ECF No. 13-10, Exh. I (W.O. Report); ECF No. 13-11, Exh. J (S.M. Report); ECF No. 13-21, Exh. U (C.S. Report).  A jury could thus reasonably conclude that the preliminary factors suggest that L.E., W.O., and S.M. are appropriate comparators.

So, too, a jury could reasonably find that two of these three "were charged with offenses of comparable seriousness."  Burley, 801 F.3d at 301 (internal quotation marks omitted).  In short, although S.M. and W.O. did not commit identical offenses to Rodriguez's, Plaintiff has done enough to "raise[] a genuine issue as to whether the alleged misdeeds of the proposed comparators were of comparable seriousness to h[is] own alleged misconduct."  Wheeler, 812 F.3d at 1118.

First, S.M. (a white male) was found to have violated MTPD General Order 245 for engaging in outside employment.  See S.M. Report at 34.  While Rodriguez was terminated after violating the same order, S.M. received only verbal counseling.  Id.  Defendant counters with important factual differences between S.M.'s secondary employment and Rodriguez's. Specifically, S.M. was not out on workers'-compensation leave at the time, and he worked just five days of secondary employment during a six-month period.  See Def. MSJ at 16–17; Pl. Response to Def. SMF, ¶¶ 59–61.  But "it is not necessary that the comparators engaged in the exact same offense" for a plaintiff to withstand a motion for summary judgment.  Wheeler, 812 F.3d at 1118.  After all, the "question of whether employees are similarly situated in order to show pretext 'ordinarily presents a question of fact for the jury.'"  Id. at 1115 (quoting George v. Leavitt, 407 F.3d 405, 414 (D.C. Cir. 2005)).  Even though the offenses were not identical, a jury

"could reasonably conclude" that violating General Order 245 by engaging in unapproved secondary employment constitutes an "offense[] of 'comparable seriousness.'" Id. at 1118.

Second, a jury could reasonably find that W.O. (a white male) also committed an offense of comparable seriousness yet was disciplined less severely. He violated MTPD General Order 217, which addresses ethical and information-disclosure standards, when he failed to report an incident involving his striking a child with his vehicle. See W.O. Report at 4–6. The MTPD administrative investigation found that W.O. was guilty of, among other things, "[b]ringing discredit to the department" and "[f]ailure to report an accident," both violations of General Order 217. Id. at 1, 5–6. Yet W.O. received only a ten-hour suspension. Id. at 6. In fairness to WMATA, Rodriguez's violation was arguably more serious than W.O.'s, as Plaintiff initially failed to disclose $500,000 in income, was found to have intentionally misrepresented information, and recorded his administrative interview. See OPRI Report at 165–66. But the D.C. Circuit has cautioned against "requir[ing] that employees always have to engage in the exact same offense as a prerequisite for finding them similarly situated." Wheeler, 812 F.3d at 1118. The fact of the matter is that Rodriguez was terminated for violating General Order 217 after failing to disclose information, while W.O. was suspended for ten days for the same omission. That is enough for a jury to find the two men similarly situated.

The Court agrees with Defendant, however, that no reasonable jury could conclude that C.S. and L.E. are appropriate comparators. As to the former, the most important difference between him and Plaintiff is that C.S. (a white male) was disciplined by Sergeant Weaver, not Chief Pavlik. See C.S. Report at 2. Plaintiff does not contest that fact in his Reply; indeed, after belaboring why C.S. was an appropriate comparator in his opening brief, Rodriguez never mentions C.S. in his Reply. See Pl. Reply at 12–15.

16

L.E. (a white woman), meanwhile, was investigated for depositing three temporary-total-disability checks sent to her in error after returning from leave.  See L.E. Report at 1.  When asked about the incident, she was truthful and explained that she was never told her disability payments should have ended when she started working light duty, and that she did not realize that she was not supposed to receive or cash the checks.  Id. at 2–3.  The initial charge of violating General Order 217 was thus not sustained, and L.E. was not disciplined.  Id. at 3–4.  Because she was not found by WMATA to have committed any offense, much less an offense of comparable seriousness, a reasonable factfinder could not conclude that L.E. is an appropriate comparator.

To be sure, Defendant raises nontrivial arguments about the differences between the offenses committed by Plaintiff and his two comparators.  For instance, it is correct that neither S.M. nor W.O. violated both General Order 217 and 245.  See Def. Reply at 16.  And it is also true that the factual conduct underlying the General Order violations differed in each case; for instance, Rodriguez made a half-million dollars while out on workers'-compensation leave, while S.M. worked just five days of outside employment and was not on leave.  These efforts to distinguish the offenses may well prove convincing at trial, but at this stage, the Court asks merely whether a jury could reasonably compare Rodriguez to white MTPD officers who were found to have violated the same General Orders yet were disciplined less harshly.  "In view of all the evidence, [the Court] cannot say that no rational and reasonable jury could find these [officers] to be comparable to" Rodriguez.  Wheeler, 812 F.3d at 1119.

Plaintiff's attempts to demonstrate "the employer's pattern of poor treatment of other employees in the same protected group as" Rodriguez could also bolster a reasonable jury's finding of pretext, even if that other evidence is not independently necessary or sufficient to

defeat Defendant's Motion for Summary Judgment.  See Wheeler, 812 F.3d at 1115.  This additional, non-comparator evidence includes: (1) instances of other Black or Hispanic employees being terminated for allegedly comparable offenses committed by white employees who were not terminated; and (2) empirical data suggesting that WMATA has disproportionately discharged Black and Hispanic officers in recent years.  See Pl. Reply at 3–4.  For instance, a Black officer was fired after cashing several disability checks he received in error upon returning to work after leave, whereas L.E. was not terminated after facially similar conduct.  See ECF No. 13-12, Exh. K (Saunders Report) at 1.  A 2019 WMATA employment-discrimination investigation report, moreover, found that while approximately 39% of MTPD officers are white, 6 of the 7 officers terminated between 2017 and 2019 were Black or Hispanic, and 12 of the 13 separations from service involved Black or Hispanic officers.  See ECF No. 18-2, Exh. Y (Saunders Investigation) at 3–5.

Ultimately, the Court need not assign such evidence dispositive weight.  The other Black and Hispanic officers who were terminated after committing allegedly comparable offenses as their white colleagues are not the plaintiffs in this case.  The record, moreover, does not conclusively demonstrate that those Black and Hispanic officers were discriminated against. See, e.g., Saunders Investigation at 9–10 (investigation concluded that Saunders was not discriminated against on basis of race.  Insofar as Plaintiff attempts to bring in empirical evidence supporting an inference of "systematic or general discrimination," he has not presented the type of robust statistical evidence and analysis necessary to make such a stand-alone finding. He has not, for instance, attempted "to control for potential confounding factors," In re Navy Chaplaincy, 738 F.3d 425, 429 (D.C. Cir. 2013), or to conduct a mathematical analysis beyond presenting the raw number of terminations by racial category.  At the end of the day, then, the

additional evidence that Rodriguez gestures at could buttress a reasonable jury's finding of pretext based on the comparator evidence, but it alone does not mandate a denial of summary judgment. That conclusion is consistent with the instruction that while statistical evidence "is admissible and may be helpful" in an "individual disparate treatment" case, such evidence is "ordinarily not dispositive." Krodel v. Young, 748 F.2d 701, 710 (D.C. Cir. 1984) (citing Furnco Constr. Co. v. Waters, 438 U.S. 567 (1978)).

*     *     *

Before concluding, the Court is mindful that Plaintiff also cross-moved for summary judgment. See Pl. Opp. at 1. Once a court "determines that one party is not entitled to summary judgment, it changes tack on the cross motion and gives the unsuccessful movant all of the favorable factual inferences that it has just given to the movant's opponent." Clark v. Vilsack, No. 19-394, 2021 WL 2156500, at *2 (D.D.C. May 27, 2021) (internal quotation marks omitted). It is of course "possible for a court to deny summary judgment to both sides." Id. The Court will take that approach here.

Even though a reasonable jury could find that WMATA's stated reason for discharging Rodriguez was pretextual, it could also conclude that he failed to "prove that, despite the proffered reason, []he has been the victim of intentional discrimination." Figueroa, 923 F.3d at 1086. Most notably, a jury could reasonably determine that the alleged comparators had not committed offenses of comparable seriousness and thus were not similarly situated "in all relevant respects." Wheeler, 812 F.3d at 1116. The Court will therefore deny summary judgment to Plaintiff as well.

**IV.**      **Conclusion**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary

Judgment on Plaintiff's claim under the DCHRA, as well as his claims of national-origin

discrimination, color discrimination, and pattern-or-practice discrimination pursuant to Title VII.

The Court will deny Defendant's Motion with regard to Rodriguez's individual race-

discrimination claim brought under Title VII.  It will also deny Plaintiff's Motion for Summary

Judgment.  A separate Order so stating will issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  August 23, 2021